IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

VICTORIA A. HOLLOWAY,                )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        CASE NO. 2:20-CV-943-KFP
                                     )
TELAGEN, LLC,                        )
                                     )
            Defendant.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff Victoria A. Holloway filed this lawsuit against Defendant TelaGen, LLC alleging Title VII claims under the Pregnancy Discrimination Act ("PDA") for pregnancy discrimination and retaliation; interference and retaliation claims under the Family and Medical Leave Act ("FMLA"); and interference and retaliation claims under the Families First Coronavirus Response Act ("FFCRA"). Doc. 1. TelaGen filed a Motion for Summary Judgment (Doc. 35) and supporting memorandum (Doc. 36); Holloway filed a response (Doc. 40) and supporting materials (Doc. 41); and TelaGen filed a reply brief (Doc. 42). Based on the parties' submissions and the applicable law, the motion is due to be GRANTED.

## I.    SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a

reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine dispute for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R. Civ. P. 56(a).

## II.    UNDISPUTED FACTS

### A.    Holloway's Employment with TelaGen

TelaGen operates in a unique space recovering birth tissue from mothers giving birth by caesarean. Holloway was employed with TelaGen as a recovery technician from 2017 to 2020. Recovery technicians are assigned "cases" each day, which are the scheduled caesarean births for the following day. For each case, the recovery technicians are expected

to meet with the expectant mother in the hospital to gain her consent to donate her birth tissue to TelaGen. The birth tissue recovered can be used for a variety of tissue grafts, including for a burn patient's wounds. Telegan provided recovery technicians with pay incentives to achieve a certain number of donors within a two-week period.

Holloway was assigned to TelaGen's Montgomery office working with mothers giving birth at Baptist Medical Center East, which is walking distance from that office. As a recovery technician, Holloway was expected to arrive at the hospital at 6:00 a.m. to begin working with the mothers scheduled for delivery. Doc. 37-3 at 11:19–12:10.[1] Before a consenting mother's c-section, the recovery technician must complete a medical records review and consent paperwork. The technician then accompanies the mother and medical team into the operating room where the technician recovers the birth tissue. Holloway was successful in her recovery technician role and was ranked "near the top, if not the top" of the recovery technicians for performance of completed cases, and she was named employee of the year in 2019. Docs. 37-4 at 83:6–14; 37-6 at 72:3–7.

Holloway reported to recovery manager Ellen DeFleron beginning in early 2020, and DeFleron reported to operations manager Teresa Carter. Carter reported to director of operations Brett Miller. Holloway and the recovery technicians in Montgomery worked with little day-to-day management oversight, as DeFleron was in Dothan and Carter was in Mobile; both were in Montgomery about once per week. The recovery technicians did not always see each other at the start of each day because often they would arrive and go

---

[1] Citations to page numbers from deposition transcripts refer to the deposition page number rather than the court docket's CM/ECF page numbers.

directly to their assigned hospital or simply retrieve supplies from the office and then set off to handle cases.

### B.    Holloway's December Absence and Discipline

On December 23, 2019, Holloway failed to report to work, and she called no one to report she would be late or out. Doc. 37-3 at 33:2–5. Holloway was untruthful when she later reported to her supervisor that there were not many cases that day, giving the impression that Holloway had been at work. Doc. 37-3 at 38:2–39:18. Her absence went undiscovered until her cases for December 23 were audited, and TelaGen then discovered Holloway's missed cases. Once Carter discovered the absence and Holloway's dishonesty about her attendance on December 23, Carter reported it to Miller.

On January 3, 2020, Carter and Miller met with Holloway to discuss the December 23 absence without calling and the false explanation she had provided to Carter. Doc. 37-3 at 33:6–9. Initially, Holloway maintained that she had been at work on December 23. After Holloway took a restroom break, Miller and Carter reconvened the meeting about her December 23 attendance. Doc.37-6 at 64:11–65:22.[2] Holloway then admitted to Carter

---

[2] Carter maintains that Holloway's coworker, Amanda Simmons, contacted her during the break to report that Holloway was texting Simmons at the time, asking that she cover for Holloway and say she was at work on the day in question. Miller also testified that he confirmed the same with Simmons during the break. Doc. 37-4 (II) at 12:9–13:4. Holloway maintains she never contacted Simmons that day. The facts must be taken in the light most favorable to Holloway; thus, the Court credits her version of this event.

and Miller she had been untruthful and conceded she was not at work at all on December 23. Doc. 37-3 at 33:2–9, DXs 2–3.

Miller considered the circumstances and elected to give Holloway a second chance. He sent Holloway an email on January 6, 2020, which served as a counseling:

> Under no circumstance is lying about your whereabouts while you are suppose [sic] to be at work acceptable . . . Instead of communicating directly with your Manager, Teresa Carter, you pretended that their [sic] were not as many cases and that one declined. In truth there were 7 c-sections during your shift on 12/23/2019.

Doc. 37-3 at DX 2. Going forward Holloway was to "report anything that prevents [her] from getting to work appropriately." *Id.* Plaintiff acknowledged the issue and confirmed it would not happen again. *Id.*

### C.   Plaintiff's Pregnancy and the Pandemic

Sometime after the January 2020 meeting about Holloway's December absence and dishonesty, Holloway informed TelaGen she was pregnant. In March 2020, TelaGen, like other organizations, began grappling with the impact of the global COVID-19 pandemic. TelaGen held a company-wide telephone conference on March 19 to address its response to the pandemic. During the call, Holloway voiced concerns about TelaGen's provision of personal protective equipment ("PPE"), and she also addressed her concerns about the need for leave due to school or daycare shutdowns. Doc. 41-1 ¶ 7. She expressed her belief that as a pregnant person she was in an at-risk group and inquired about the company's plans for accommodations. *Id.* Holloway was scared at the time because "we didn't know anything about the COVID-19 pandemic." *Id.*; Doc. 37-3 at 62:4–7. During the call,

COVID-19 exposure and other issues related to the evolving pandemic were discussed. Doc. 37-3 at 61:1–62:7.

### D.    Holloway's April Tardy

Before the workday began on April 13, 2020, DeFloren sent Holloway a text message requesting the following: "If you stop by the office before you go to the hospital, can you check your temperature nodes and make sure they're connected please?" Doc. 37-6 at 147. The message was sent at 5:12 a.m. after DeFleron had received a notification that the temperature log was offline in the Montgomery office, and she was seeking confirmation of that status. *Id*. The temperature nodes monitor the ambient air temperature, and it was DeFloren's job to ensure that the alarm related to the temperature was addressed. Holloway responded affirmatively, "Yes, ma'am!" *Id*.

Around 6:00 a.m., recovery technician Sunni Ryan called DeFleron and reported she had checked the temperature nodes, which were off due to a power outage. Doc. 37-5 at 74:8–12. Ryan also asked DeFleron to keep in confidence that Ryan had made this report, which Ryan claimed was done at Holloway's direction. Doc. 37-5 at 74:8–16. Holloway acknowledges communicating with Ryan and asking her to check the temperature nodes if she arrived at the office before Holloway, but she denies asking Ryan to conceal the request because she was going to be late to work. Doc. 41-1 ¶ 20(f). Holloway maintains she asked Ryan to check the temperature nodes if Ryan arrived at the office before Holloway. *Id*.

Holloway did not arrive by her 6:00 a.m. workday start and did not report to her supervisor that she would be late; she says she arrived around 6:15 a.m. *Id*. at ¶ 10. At 6:50 a.m., Holloway contacted DeFloren with the requested temperature information. She texted

DeFloren to report the power was out at the office—a fact Ryan had already reported. Later at 8:33 a.m., Holloway again contacted DeFloren by text to report that the power had been restored, but the internet remained out. She never reported she was late arriving to work. *See* Doc. 41-1 at ¶ 10.

### E.    TelaGen's Termination Decision

DeFloren believed Holloway arrived late based on her text messages about the temperature and power issues that arrived well after 6:00 a.m. and the report she received from Ryan about checking the temperatures. Doc. 37-5 at 73:22–75:3. DeFloren talked to Carter about Holloway being late to work again without calling ahead, and DeFloren shared that Holloway had asked Ryan to check the temperature logs because she was not there; Carter then relayed the information to Miller. Doc. 37-5 at 75:4–21.[3] Under the circumstances, Miller viewed Holloway's failure to timely report as dishonest because "she was not there and . . . she was not at work on time"; Holloway had not informed her supervisor she would be late and had another employee do a task she was assigned. Doc. 37:4 (II) at 24:12–15, 27:22–25; Doc. 37-1 at ¶ 11. Based on his conclusion that Holloway was dishonest, on April 13, 2020, Miller decided to terminate Holloway's employment—

---

[3] Carter also testified that DeFleron shared with her that Ryan had not seen Holloway until 8:30 a.m. that morning. Doc. 37-6 at 96:11–97:1. However, in her deposition testimony, DeFleron could not recall having told Carter that Holloway was not seen by Ryan until 8:30 a.m. Doc. 37-5 at 74:23–75:21; 92:1–15. Holloway recalls being told that no one had seen her until 8:30 a.m. Doc. 41-1 at ¶ 13. Because they were assigned to work at different hospitals and report there first, typically, Ryan and Holloway would not necessarily be expected to cross paths at the start of the workday. *See* Docs. 41-1 at ¶ 20(h) (Holloway was assigned to Baptist East and Ryan was assigned to Baptist South and Jackson hospitals); 37-6 at 94:9–95:2. While there is a factual dispute as to how late Holloway arrived to work on April 13, 2020—arriving at 6:15 a.m. as Holloway says or 8:30 a.m. as attributed to Ryan—this dispute is immaterial. The Court must view the facts in the light most favorable to Holloway, accepting her testimony that she arrived late at 6:15 a.m. The fact that she arrived late, which is material, is not in dispute.

he did not, however, communicate the decision to Holloway, Carter, or DeFloren. Doc. 37-4 (II) at 30:11–33:19, 27:15–21; Doc. 37-1 at ¶ 11. Before acting on his decision, Miller advised the company's CEO and COO of his decision, and at that time the company was dealing with the onset of the pandemic, which may have impacted the timing of getting notice of his decision delivered to Holloway. Doc. 37-4 (II) at 30:11–31:18.

On April 14, 2020, Carter and DeFloren met with Holloway about the April 13 events. Doc. 37-5 at 77:7–17. They told Holloway that no one had seen her until 8:30 a.m. that day. Doc. 41-1 at ¶ 13. Holloway's text to DeFleron about the office's power connection came through at 8:33 a.m. Doc. 37-6 at 147. Holloway admitted to them that she had arrived to work late, arriving at 6:15 a.m. that morning. Doc. 41-1 at ¶ 13. Holloway also acknowledged that she had asked Ryan to check the temperature sensors. *Id*. Although Holloway was late to work on April 13, she did not miss any assigned cases or leave any work assignments undone. *Id*. at ¶ 12.

### F.    Holloway's Leave Request

During the April 14 meeting, the women discussed a forthcoming change in assignments. Holloway was advised that starting on April 20 the recovery technicians in Montgomery would be rotating cases between the three Montgomery hospitals. Doc. 37-3 at 66:3–7, DX 3. TelaGen intended this change to facilitate the building of rapport among hospital staff and TelaGen employees and to provide training opportunities for employees in hospitals new to them. Doc. 37-3 at 55. Holloway did not want the change because it would require her to travel farther to Baptist South hospital, she was concerned she would have fewer cases there than she had enjoyed at Baptist East, and she worried her pay would

correspondingly decrease. Doc. 37-3 at 68:20–71:12. Holloway understood though that the change presented an opportunity for additional practice and interaction at the hospitals. Doc. 37-3 at 59.

On April 15, 2020, Holloway applied for leave under the FFCRA. Her child's daycare had closed due to the onset of the pandemic, and her family members were no longer able to help her with childcare. After turning in all the necessary paperwork to TelaGen's executive administrator assistant Brandy Davis, Holloway's leave request was approved the following day to be effective April 19, making April 17 her last workday before leave. Doc. 41-1 at ¶ 16.

Davis may have communicated the leave request or its approval to DeFloren; she told someone at TelaGen about it. Doc. 37-2 at 17:5–16. Miller was not informed of the leave request until after he had made the decision to terminate Holloway's employment. Doc. 37-4 (I) at 55:14–57:4.

## G.  Holloway's Termination from Employment

On April 16 or 17, 2020, Miller communicated to Carter his decision to terminate Holloway's employment. Doc. 37-4 (II) at 33:22–34:3. Carter was instructed to relay the termination decision to Holloway. *Id*. at 34:5–19. On April 17, Carter met with Holloway and terminated Holloway's employment effective immediately. Docs. 37-3 at 37:3–6, 37-6 at 132:4–13. According to Holloway, Carter informed Holloway that her employment was terminated for not reporting to work on April 13 until 8:30 a.m. Doc. 41-1 at ¶ 17.

### III.    DISCUSSION

#### A.    FMLA Claims

Holloway concedes that TelaGen does not have the sufficient number of employees to be subject to claims under the FMLA. Therefore, TelaGen's motion for summary judgment on Holloway's FMLA interference (Count III) and FMLA retaliation (Count IV) claims is GRANTED.

#### B.    FFCRA-EFMLEA Claims

The FFCRA created temporary provisions in response to the global COVID-19 pandemic, including the Emergency Family and Medical Leave Expansion Act ("EFMLEA"), which temporarily amended the FMLA requiring covered employers provide up to 12 weeks of job-protected leave for employees who have been on the job for at least 30 days and who are unable to work or telework due to childcare needs resulting from the coronavirus. *See* FFCRA §§ 3102(a)(2); 3102(b) (adding FMLA §§ 110(a)(1)(A), (a)(2)(A)); 29 U.S.C. § 2612. While TelaGen was too small to be subject to traditional FMLA, it is undisputed the provisions of the EFMLEA, which applied to organizations of smaller size, applied to TelaGen. *See* 134 Stat. at 192; 85 Fed. Reg. 19,326,19,327 (Apr. 6, 2020); 29 C.F.R. § 826.20(b).

##### 1.    Interference Claim

The elements of proof for a claim under the EFMLEA are analyzed using the traditional FMLA rubric. *See Martinez v. Aspen Dental Mgmt., Inc*., No. 2:20-CV-545-

JES-MRM, 2022 WL 523559, at *5 (M.D. Fla. Feb. 22, 2022);[4] *Outlaw v. Prattville Health & Rehab., LLC*, No. 2:22-CV-31-WKW, 2022 WL 1491666, at *3 (M.D. Ala. May 11, 2022) ("The EFMLEA incorporated the provisions of the FMLA prohibiting an employer's interference with or retaliation against employees taking EFMLEA leave.") (citing 29 C.F.R. § 826.151(a) (2020)). "To establish an interference claim, 'an employee need only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied.' [ ] The employee need not allege that his employer intended to deny the benefit, because 'the employer's motives are irrelevant.'" *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (quoting *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206–07 (11th Cir. 2001)).

However, the right to take that qualified leave is not absolute. "[T]he employer can raise the lack of causation as an affirmative defense." *Spakes v. Broward Cty. Sheriff's Office*, 631 F.3d 1307, 1309 (11th Cir. 2011). To establish the affirmative defense, the employer must "demonstrate[] that it would have discharged [the] employee 'for a reason

---

[4] While *Martinez* is not binding on this Court, its analysis of this still relatively new law is persuasive, particularly given the dearth of caselaw on the subject. As *Martinez* points out:

> 'The acts that are prohibited as to FMLA, are equally prohibited as to EFMLEA, such as, interference with the exercise of rights, discrimination, and retaliation.' *Collazo* [v. *Ferrovial Construcción PR, LLC*, No. 20-1612 (DRD), 2021 WL 4482268 at *5, 7, 2021 U.S. Dist. LEXIS 191397 at *12-13 (D.P.R. Sept. 30, 2021)], 2021 WL 4482268, at *5, 2021 U.S. Dist. LEXIS 191397, at *14-15 (D.P.R. Sept. 30, 2021)(citing 29 C.F.R. § 826.151(a)); *see also Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d 1048, 1052 (11th Cir. 2020) ("In plain English, an employer may not do bad things to an employee who has exercised or attempted to exercise any rights under the statute."). Because 'there is scant caselaw interpreting the possible issues arising from the [EFMLEA] statute or the regulations,' *Colombe v. SGN, Inc*., No. 5:20-CV-374-REW, 2021 U.S. Dist. LEXIS 59485, 2021 WL 1198304, at *2 (E.D. Ky. Mar. 28, 2021), the Court will look to the pertinent statutory language and regulations, as well as FMLA cases to construe the EFMLEA.

*Martinez*, 2022 WL 523559, at *5.

wholly unrelated to the FMLA leave.'" *Id.* at 1310 (quoting *Strickland*, 239 F.3d at 1208). Therefore, "an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig*, 602 F.3d at 1236. In *Krutzig*, like the present case, the unrebutted evidence demonstrated that the decision-maker was not aware, at the time of the termination decision, of plaintiff's request to commence qualified leave. This lack of knowledge, the court held, established as a matter of law that plaintiff's termination was for reasons other than her requested leave. *Id.*

Based on the facts presented at summary judgment, there is no dispute here that Holloway applied and demonstrated she was qualified for the requested EFMLEA leave; indeed, her request for leave was granted and set to begin on April 19, 2020. However, TelaGen has raised causation as an affirmative defense, and the uncontroverted evidence before the Court is that Miller, the sole decision-maker, was unaware of Holloway's FFCRA request or its approval until sometime after he made the termination decision. Doc. 37-4 (II) at 55:17–56:17. This lack of decision-maker knowledge fells the interference claim. The mere fact that the leave request and the communication of the termination decision were close in time does not raise an issue of material fact sufficient to submit the claim to a jury. The timing of Miller's decision on April 13 and lack of knowledge about the April 15 leave request demonstrate sufficient evidence that Holloway would have been terminated from her employment regardless of the leave request. *See Herren v. La Petite Acad., Inc.*, No. 2:16-CV-01308-LSC, 2022 WL 1203817, at *3 (N.D. Ala. Apr. 22, 2022) (granting summary judgment where employer began process of terminating plaintiff before

leave requested by placing employee on administrative leave while investigating, which demonstrated the termination was for reasons wholly unrelated to the FMLA leave and the close timing between the application for leave and the termination decision failed to raise an issue for the jury). TelaGen is, therefore, entitled to summary judgment on the FFCRA interference claim.

### 2.    Retaliation Claim

Holloway's opposition to TelaGen's summary judgment motion does not address her EFMLEA retaliation claim, which is the sixth count[5] of her Complaint. Doc. 1, ¶¶ 112-120. "[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resol. Tr. Corp. v. Dunmar Corp*, 43 F.3d 587, 599 (11th Cir. 1995) (citing *Rd. Sprinkler Fitters Loc. Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)). Because Holloway fails to address this claim in response to the motion for summary judgment, she has abandoned the EFMLEA retaliation claim.[6] Thus, summary judgment is GRANTED on this claim.

---

[5] The count heading number appears to bear a scrivener's error, as it is labeled as "Count IV" instead of Count VI. In conceding the FMLA claims, Holloway notes that she still pursues (only) the FFCRA interference claim. Doc. 40 at 28 n. 12.

[6] The Court finds the grounds put forth by TelaGen well-taken, particularly given the lack of causation evidence connecting Holloway's request for leave (April 15) and the decision to terminate her employment (April 13).

C.    **Title VII Pregnancy Claims**

1.    **Pregnancy Discrimination**

Congress amended Title VII by enacting the PDA, bringing pregnancy discrimination within the existing statutory framework prohibiting discrimination on the basis of sex. Thus, the analysis of a pregnancy discrimination claim is the same used in other Title VII sex discrimination suits. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312–13 (11th Cir. 1994) (citing *Maddox v. Grandview Care Ctr., Inc.*, 780 F.2d 987, 989 (11th Cir. 1986)). To establish a prima facie case of pregnancy discrimination, a plaintiff in a case such as this one must demonstrate: (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse effect on her employment; and (4) plaintiff suffered differential treatment. *See Armstrong*, 33 F.3d at 1314; *accord Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).

In this case, Holloway argues that she can demonstrate pregnancy discrimination under a circumstantial evidence framework. To do so, she may rely on the familiar *McDonnell Douglas* framework. Under this framework, a plaintiff must first establish a prima facie case of discrimination, and the burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981).

Here, there is no dispute the prima facie case is established as to the first three elements. As to the fourth element, Holloway relies on comparators to make this prima facie showing. In the Eleventh Circuit, comparators may be used to fulfill this prima facie

element where the plaintiff demonstrates she and her comparators are "similarly situated in all material respects." *Lewis v. City of Union City, Georgia*, 918 F. 3d 1213, 1224 (11th Cir. 2019) (en banc). Typically, a proper comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor," and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28. The analysis on summary judgment viewing the evidence in the light most favorable to the plaintiff must be "worked out on a case-by-case basis, in the context of individual circumstances." *Id*. at 1227. In an attempt to satisfy the comparator analysis, Holloway points to two recovery technicians like herself, and she points to DeFloren, her supervisor.

### a.  Holloway's Prima Facie Case

First, DeFloren is not a proper comparator. Defloren, unlike Holloway, was not a recovery technician in 2020.[7] She was a recovery manager supervising technicians. DeFloren had responsibilities different from Holloway, including traveling to various office locations where her ten or so supervisees were located, including Opelika, Mobile, and Montgomery in Alabama and other locations in Georgia and Florida. Doc. 37-5 at 31:12-17. She was in Montgomery once a week and did not have set hours in the Montgomery office. Doc. 37-6 at 13:11–14:1. Therefore, she did not have a daily reporting obligation at the same office and hospital location, as Holloway did. Unlike Holloway, she

---

[7] DeFloren worked as a recovery technician previously but became a recovery manager in 2020. Doc. 37-5 at 11:9–15.

did not meet with expectant mothers and recover tissue in the operating room. Doc. 37-5 at 72:4–6. Additionally, there is no evidence before the Court that DeFloren, unlike Holloway, previously lied to her supervisor about her whereabouts or ever engaged in dishonest conduct. Finally, there is no evidence that the decision-maker, Miller, was aware of DeFloren's attendance record. Because of these material distinctions, DeFloren's habitual tardiness, as Holloway claims, is inconsequential. *See Cyprian v. Auburn Univ. Montgomery*, 799 F. Supp. 2d 1262, 1282 (M.D. Ala. 2011) ("Material differences in ranks and responsibilities are relevant for considering whether an employee is a proper comparator.") (citing *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008)). If DeFloren was habitually tardy but not counseled about it, it does not impugn TelaGen's decision to treat Holloway differently, as she worked in a different position and engaged in different conduct (being a no call/no show and lying about it, being counseled for it, and being subsequently late without calling a supervisor, which was adjudged under the circumstances as dishonest).

Second, Holloway's coworkers who were recovery technicians are also inadequate comparators to carry her prima facia case. Holloway was counseled for being a no call/no show and lying to her supervisor about her absence, and, when she was subsequently tardy for work without notifying her supervisor, Miller assessed the conduct under the circumstances as dishonest. Considering these events in total, Miller decided to terminate Holloway's employment. As the chart below demonstrates, Holloway's conduct was not similarly situated in all material respects to her coworkers' dilatoriness.

| | Dishonest about absence or tardiness | Counseled about tardiness or absence | Tardy without calling ahead after being counseled | Deemed dishonest in handling tardy arrival after counseling |
|---|---|---|---|---|
| **Ashlyn Looser, recovery technician** | | Habitually tardy and discussed it with supervision. Doc. 41-2 at ¶¶ 5, 6. She was once over three hours late and was counseled by email about her tardiness. *Id*. | | |
| **Lauren Derzis, recovery technician** | Lied about her whereabouts. Doc. 37-4 (II) at 17:24–19:21. | Counseled on January 3 for tardiness and not notifying supervisor; tardy multiple times. Doc. 37-3 at 47:15–48:3; Doc. 41-1 at ¶ 19. | | |
| **Holloway, recovery technician** | Lied about her December 23 absence. | Counseled regarding December 23 absence and dishonesty. | Tardy to work on April 13 without calling ahead. | After learning of Holloway's April 13th tardiness without calling ahead, Miller concluded she was dishonest. |

While Looser and Derzis had repeated tardiness, they did not engage in conduct similar in all material respects to Holloway's conduct. Derzis was not absent or tardy <u>after</u> being counseled, according to Miller. Also according to Miller, there has been no other recovery technician under his supervision who, like Holloway, was previously counseled about being a no call/no show and being dishonest, who was again late to work and failed to notify the supervisor, and who was again deemed dishonest. Doc. 37-1 at ¶¶ 13, 14.

Looser, unlike Holloway, was not dishonest to TelaGen with respect to her presence at work. She was frequently tardy, but there is no evidence she was tardy without notifying her supervisor, and she was not tardy again after being counseled for such conduct. While there may be evidence that TelaGen was, at times, lackadaisical about tardiness, there is no evidence that Looser was a no call/no show and was dishonest about her whereabouts on any occasion. These distinctions preclude the crucial finding of materiality that would support an inference that these coworkers were treated differently because they were not pregnant like Holloway. On this record, that inference of discrimination is unsupported, and the prima facie case cannot rest on a comparator analysis.[8] *See, e.g., McNeal v. International Paper*, No. 21-12672, 2022 WL 5434274, at *3 (11th Cir. Oct. 7, 2022) (in case where plaintiff was terminated after four disciplinary actions, finding employee who received six disciplinary actions was not proper comparator because two of the actions were removed under the company's policy of removal after twelve months, a benefit plaintiff had also received, and no comparison with two employees who slept on or damaged a forklift, as plaintiff provided no information relating to the employees, the timing of incidents, or their disciplinary history).

Comparator evidence is not the only way a plaintiff may circumstantially show an inference of discrimination. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (stating a plaintiff can survive summary judgment if there is sufficient

---

[8] Holloway's comparator argument seeks to exclude Miller's determination of dishonesty and compare only tardiness because Holloway asserts she was not dishonest on April 13, 2020. To the extent this dishonesty is disputed, it is not a material factual dispute, as discussed *infra*. And, the tardiness records without it still bear out material distinctions.

circumstantial evidence to create a triable issue regarding employer's discriminatory intent); *Nelson v. Chattahoochee Valley Hosp. Soc.*, 731 F. Supp. 2d 1217, 1231 (M.D. Ala. 2010) ("A court must not be straitjacketed by a particular formulation of the prima-facie case; its ultimate aim must be to determine whether the plaintiff has proffered sufficient evidence to create an inference of discrimination, and while comparator evidence may be the best method by which to do so, the plaintiff may rely on other circumstantial evidence instead."). In an effort to point to other circumstantial evidence from which an inference of discrimination could arise, Holloway says she was not dishonest on April 13 when she was late to work and failed to notify her supervisor. Holloway does not dispute she was late and failed to call-in to report her anticipated tardiness, but she argues TelaGen's conclusion she was dishonest is wrong and a cover for discrimination.

Because this argument bleeds into the issue of pretext, for the sake of brevity, the Court moves to the pretext analysis. *See Vickers v. Hyundai Motor Mfg. of Ala., LLC*, No. 2:14-CV-126-WKW, 2015 WL 5736909, at *8 (M.D. Ala. Sept. 30, 2015), *aff'd sub nom. Vickers v. Hyundai Motor Mfg. Ala., LLC*, 648 F. App'x 751 (11th Cir. 2016) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1268–69 (11th Cir. 2001) (assuming without deciding a prima facie case is met in order to proceed to the salient issues of a pretext analysis); *Rawls v. Ala. Dep't of Human Resources*, 507 F. App'x 895, 898 (11th Cir. 2013) (affirming district court that moved ahead to pretext and assumed a prima facie case); *Long v. Ala. Dep't of Human Resources*, 2014 WL 8843764, at *27 (M.D. Ala. Nov. 10, 2014), adopted in relevant part by *Long v. Ala. Dep't of Human Resources*, No. 2:13CV176-MHT, 2015 WL 2345240 (M.D. Ala. Jan. 30, 2015), *aff'd in part, rev'd in*

*part and remanded,* 650 F. App'x 957 (11th Cir. 2016) (declining to undergo a prima facie analysis so as to examine evidence of pretext). Even if the Court were able to find a prima facie case on circumstantial evidence, summary judgment must nevertheless be granted after reviewing the articulated legitimate, non-discriminatory reasons for the termination decision and Holloway's pretext arguments.

### b. TelaGen's Legitimate, Non-Discriminatory Articulation and Pretext

After a prima facie case showing, if the defendant successfully articulates a legitimate, nondiscriminatory reason for its action, the burden shifts once again to the plaintiff, who may avoid summary judgment by producing "sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000). To show pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted). Ultimately, if "the proffered reason is one that might motivate a reasonable employer, [the plaintiff] must meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. To get there, a plaintiff must show more than a mistaken belief about the facts on which a defendant based the non-discriminatory reason. Instead, a plaintiff must present evidence from which a reasonable jury could find that the defendant did not honestly believe the facts upon which he based his decision and that the real reason was discrimination. *See*

*Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002); *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1260 (11th Cir. 2001) ("pretext means more than a mistake[;] pretext means a lie, specifically a phony reason for some action") (citations omitted); *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002) ("A plaintiff trying to show pretext based on a defendant's dishonest belief of the grounds the defendant gave for his decision does not succeed by presenting evidence that the defendant was mistaken about the facts upon which he based his alleged non-discriminatory decision."). For the pretext showing, "'a plaintiff must establish [] *both* that the reason was false, and that discrimination was the real reason.'" *Franks v. City of Jasper*, No. 7:20-CV-00077-LSC, 2022 WL 4096882, at *4 (N.D. Ala. Sept. 7, 2022) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

As articulated, TelaGen terminated Holloway's employment because she was tardy and failed to notify her supervisor after being counseled not to engage in such behavior and because Miller determined that her behavior on this occasion was dishonest based on the circumstances. He knew about the December 23 events leading to Holloway's counseling; about April 13 he had the following information: Holloway was late to work, she did not report ahead to her supervisor, she represented to DeFloren that she would check the temperature nodes when she arrived, Ryan informed DeFloren that Holloway asked Ryan to check the temperature nodes, Ryan reported the power outage to DeFloren, Ryan asked DeFloren not to let Holloway know Ryan contacted DeFloren, Holloway texted DeFloren at 6:50 a.m. about the power outage, and Holloway was not seen at the hospital or office until after 8:30 a.m. Holloway disclaims any dishonest conduct, and she denies having

instructed Sunni Ryan to cover up the request to check the thermometer nodes. She relies on this to create a summary-judgment-precluding dispute of fact.

Holloway relies on *Munoz v. Oceanside Resorts, Inc*., 223 F.3d 1340 (11th Cir. 2000) to argue that her disclaimer of dishonesty on April 13 is sufficient to create a material factual dispute on the issue of pretext that a jury must decide. The Court disagrees. *Munoz* is distinguishable. Munoz sued his former employer, Oceanside Resorts, for age discrimination. The resort had issued Munoz a reprimand for kissing a coworker on the cheek and gave Munoz an admonishment that he not discuss the reprimand with anyone. The resort maintained that the manager's secretary, who signed the reprimand, reported that Munoz had confronted her about the reprimand. In response to this report, the resort manager terminated Munoz's employment for insubordination. Munoz denied the confrontation occurred.

In affirming denial of the resort's renewed motion for judgment as a matter of law at trial, the Eleventh Circuit found that "Munoz presented a substantial quantum of evidence from which a reasonable jury could infer that the [ ] proffered explanation for his termination was pretextual." At trial, the secretary was the only witness, pitting her word against that of Munoz. Thus, "[i]f the jury rejected [the secretary's] testimony concerning the alleged confrontation, it likewise could reject her further testimony regarding the reporting of that incident. A reasonable jury accordingly could accept Munoz's theory of events: that [the manager] concocted a scheme that included both a bogus reprimand and a subsequent false accusation of insubordination to cover his discriminatory desire to discharge an older employee." *Munoz*, 223 F.3d at 1345. In rejecting the resort's argument

that Munoz could not survive its motion merely by discrediting the proffered reason for the termination, the court noted that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" *Id*. at 1346 (quoting *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133 (2000)). Where these two showings are made, the plaintiff may satisfy her burden of undermining the legitimacy of the employer's proffered reason.

In Holloway's case, unlike in *Munoz*, it is not her word against Ryan's word serving as the sole underpinning for the decision to terminate her employment. Holloway cannot rely on this factual dispute between herself and Ryan to create a jury question as to whether TelaGen's reason for termination was a pretext for discrimination. Denying she told Ryan to conceal her request to check the temperature because she was late to work does not impugn the credibility of the termination decision because it was not the crux of the decision. First, Ryan did not report that Holloway asked her to conceal the temperature nodes to Miller, the decision-maker. She reported that to DeFloren, who reported it to Carter, who then gave the information to Miller. Additionally distinctive here, unlike in *Munoz*, several pieces of information—not solely Ryan's report regarding concealment— went into Miller's conclusion that the conduct on April 13 was dishonest and that Holloway was late without calling a supervisor, again. Thus, Holloway cannot show both that

TelaGen's reason was false and that it was a cover for discrimination, in this context, simply by asserting she did not ask Ryan to cover for her.

However, it is not material on summary judgment whether Holloway lied about her interaction with Ryan or Ryan lied about Holloway's request. In other words, it is immaterial whether Miller adjudged Holloway dishonest by having committed a lie of omission—not calling ahead to tell her supervisor she would be late and getting a coworker to do a task she was assigned, thus resting on the hope that no one would learn of her tardiness—or a lie of an affirmative nature, calling Ryan and asking her to cover for Holloway's absence by not revealing Holloway's request for the temperature check. Miller's assessment of the situation in either event was not unreasonable, and Holloway's dispute about engaging Ryan to cover for her is inconsequential.

Miller believed Holloway was late for work. That was, indeed, accurate. Miller believed Holloway not to have called her supervisor ahead to notify the supervisor she would be late. That was, in fact, true. Miller believed Holloway asked a coworker to perform a task that Holloway's supervisor had requested she perform. The facts bear this out. Miller believed that Holloway's actions, considered in total, were dishonest. Whether he made an incorrect assessment of the situation, for instance, if Holloway did not ask Ryan to cover for her, is not material. Based on what he knew, the record reflects a reasonable and honest judgment on his part. There is no testimony to refute his belief that Holloway's conduct was dishonest; she asked a coworker to do something she was asked to do and,

without calling a supervisor ahead of time, "she was not there and . . . she was not at work

on time." Doc. 37-4 (II) at 24:12–15. Those facts are undisputed.

In further support of her pretext argument, Holloway also points the Court to

TelaGen's response to her claim for unemployment compensation with the Department of

Labor and maintains that the company's description of her termination there is different

from its description of the decision now. These differing reasons, Holloway maintains,

show the reasons offered for her termination were a pretext.

The Court is not persuaded that there is an inconsistency of the nature that would

demonstrate pretext. TelaGen's Department of Labor submission in the blank asking

"reason for discharge" describes the termination decision "for absenteeism/lateness" after

a warning for "failing to communicate her absenteeism," (Doc. 41-4) and Miller's

description of his decision in deposition includes the further characterization of the conduct

as dishonest. As a practical matter, these descriptions are not mutually exclusive or

inconsistent. To the extent differences in the reasons exist at all, those distinctions do not

demonstrate *changed* or *shifting* reasons but rather further explanation. *See Moore v.

Jefferson Cnty. Dep't of Human Resources*, 277 F. App'x 857, 860 (11th Cir. 2008)

("[A]lthough the reasons cited for promoting the female candidates in the EEOC position

statement differed slightly from deposition testimony, that alone does not establish pretext,

. . . [n]one of those reasons were inconsistent with one another.") (citing *Tidwell v. Carter

Prod.*, 135 F.3d 1422, 1428 (11th Cir. 1998); *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d

1453, 1458–59 (11th Cir. 1997)). Additionally, there is no evidence Miller prepared the DOL form. *See* Doc. 37-2 at 22:1–23:12.

To demonstrate pretext based on an inconsistent reason for the adverse decision, something more is needed. *See Woodard*, 298 F.3d at 1265 ("[P]laintiff must present evidence from which a reasonable jury could find that the defendant did not honestly believe the facts upon which he allegedly based his non-discriminatory decision."); *Ghioroaie-Panait v. Rolle*, No. 3:17-CV-00698-ALB-WC, 2020 WL 130892, at *6 (M.D. Ala. Jan. 10, 2020), *appeal dismissed sub nom. Ghioroaie-Panait v. Bd. of Trustees of Auburn Univ.*, No. 20-10794-BB, 2020 WL 5126380 (11th Cir. July 1, 2020) ("[T]o create an inference of pretext based on an employer's inconsistent reasons, '[t]he new reasons relied on in litigation must plainly contradict the reasons relied on at the time of the decision.'") (citing *Pate v. Chilton Cnty. Bd. of Educ.*, 853 F. Supp. 2d 1117, 1133–34 (M.D. Ala. 2012) and *Thomas v. Dolgencorp, LLC*, 30 F. Supp. 3d 1340, 1351 (M.D. Ala. 2014) (finding that alternative reasons asserted by employer did not create inference of pretext)). Reasons offered that do not match word-for-word may nonetheless be consistent reasons so long as they are not contradictory reasons. TelaGen's reasons are not contradictory.

Finally, in passing (Doc. 40 at 20), Holloway argues as part of her circumstantial evidence that the timing between her April 2020 termination and the March conference call regarding pandemic concerns and her pregnancy is enough to show pretext. While the decision to terminate Holloway in April and the discussions of her pandemic-related pregnancy concerns are close in time, this close temporal proximity alone cannot be used

to support an inference of discrimination on these facts. She offers no basis to support a finding of pretext based on timing alone. Shear knowledge of a pregnancy does not impute discriminatory motive to subsequent adverse action; otherwise, pregnancy would create an impregnable shield of job protection simply by informing an employer of this medical status.

This summary judgment record fails to reveal substantial evidence rebutting TelaGen's explanation for the termination decision from which a jury could conclude that the reasons were pretext for discrimination. For these reasons, summary judgment must be granted as to Holloway's pregnancy discrimination claim.

### 2.    Retaliation

Title VII prevents an employer from retaliating against an employee because the employee opposes an unlawful employment practice or because the employee has made a charge, testified, assisted, or participated in any manner related to an unlawful employment practice. *See generally* 42 U.S.C. § 2000e-3(a) (Title VII). Absent direct proof of retaliation, the *McDonnell Douglas* burden-shifting framework applies. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020). A prima facie case of retaliation has three elements: the plaintiff engaged in statutorily protected conduct; the plaintiff suffered an adverse employment action; and the adverse action was causally related to the protected expression. *Ambus v. AutoZoners, LLC*, 71 F. Supp. 3d 1280, 1301–02 (M.D. Ala. 2014) (citing *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1291 (11th Cir. 2002) (quotation omitted)).

Holloway relies on circumstantial evidence for her retaliation claim. The claim rests on the March 19 company-wide telephone conference, during which Holloway voiced concerns about the COVID-19 pandemic: she objected to the adequacy of TelaGen's provision of PPE and inquired about the company's planned accommodations for pregnant employees, like herself, who she felt were at higher risk and those, like herself, who had childcare issues due to the many daycare and school closures that had begun.

The parties address the protected activity element of the prima facie case in a cursory manner in their briefs: TelaGen says, without much more, that Holloway did not engage in protected activity (Doc. 36 at 29); Holloway, similarly without much elaboration, argues she did (Doc. 40 at 27). This is a critical component of Holloway's prima facie case. With the benefit of its own analysis, the Court finds the absence of protected activity.

To engage in protected activity under the opposition clause of § 2000e-3a, a plaintiff must have a good faith, objectively reasonable belief that the employer is engaging in unlawful employment practices. *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). The plaintiff's belief is measured against the substantive law at the time to determine whether the belief was objectively reasonable. *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir. 2001). A plaintiff's belief about an unlawful employment practice may be objectively unreasonable if the practice she complains about falls well short of the standard necessary for an adverse action. *See Howard v. Walgreen Co.,* 605 F.3d 1239, 1245 (11th Cir. 2010) (holding as objectively unreasonable a plaintiff's belief that a message threatening termination was unlawful discrimination).

Assuming Holloway could establish the subjective component, objectively, her claim cannot be sustained. Holloway argues she complained of discrimination sufficient to have engaged in Title VII protected activity by raising, on the March 2020 telephone conference call, concerns about the provision of PPE and preparations for accommodations as the pandemic began to take hold in the United States and across the globe. However, Holloway offers no basis to elevate her assertions from general issues of expressed concern about the pandemic response to something that is statutorily protected.

The reality of the situation was that the expressed concerns were those held by many employees, pregnant or not, at the start of the pandemic in March 2020. Even those with perspicacious vision could not, at that time, adequately address PPE (and other accommodation) needs, particularly for those working in health care. Complaining about inadequate PPE/accommodation in this context cannot be rebranded as a complaint of a discriminatory adverse action. A general complaint about the provision of PPE—an issue that all workers faced at the outset of the pandemic—or dealing with childcare in a world facing shutdown—an issue facing all workers with childcare responsibilities—are not actions opposing an *unlawful* employment practice. Holloway's expressions during the call did not constitute protected activity because any belief that she was being subjected to discriminatory conduct because of pregnancy due to TelaGen's approach to addressing the pandemic was not objectively reasonable. *See Harris v. Fla. Agency for Health Care Admin.*, 611 F. App'x 949, 951 (11th Cir. 2015) ("Harris claims he engaged in protected conduct when he assisted Valerie Davis in filing an administrative petition against FAHCA, but the complaint does not constitute protected participation conduct because it

did not raise a claim of discrimination or retaliation. In fact, the administrative petition claimed a violation of Florida administrative law and mentioned no unlawful employment practice."); *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (finding no statutorily protected activity when plaintiff asked supervisor to stop bullying her and complained to a former supervisor and a city commissioner that supervisor had used "vulgar, inappropriate language" and engaged in "bullying, yelling, [and] screaming," as plaintiff failed to formally or informally report supervisor's conduct to her employer and failed to complain to former supervisor and city commissioner that conduct was sexually hostile or harassing); *Saffold v. Special Couns., Inc.*, 147 F. App'x 949, 951 (11th Cir. 2005) (affirming district court finding that plaintiff's complaints did not constitute protected activity because any belief she was subjected to discriminatory conduct was not objectively reasonable; "almost all of [plaintiff's] complaints had no relationship to race; rather, they stemmed from a personality conflict [with a co-worker].").

Holloway may not have been happy about the level of PPE she was provided in March 2020 as a pregnant person or with the company's pandemic response in other areas, but without more her voiced concerns cannot be characterized as opposition to a discriminatory practice. Holloway does not point the Court to any caselaw wherein a generalized complaint like what she voiced has been given statutory protection, and this Court cannot extend it there. *See Thaxton-Brooks v. Baker*, 647 F. App'x 996, 1000 (11th Cir. 2016) (vague comments "about ethical violations and questionable hiring practices . . . do not constitute protected activities because they do not relate to racial discrimination or retaliation"); *Ghioroaie-Panait*, 2020 WL 130892, at *8 ("Though Plaintiff's three-page

email includes one reference to his belief that all employees should be entitled to work in a safe environment 'regardless of our nationality, skin color, accent, and other differences,' this passing reference to protected characteristics is not enough to constitute protected activity for purposes of his retaliation claim.") (citing *Ingram v. Sec'y of the Army*, No. 616CV150ORL37TBS, 2017 WL 4574607, at *12 (M.D. Fla. Oct. 13, 2017), *aff'd,* 743 F. App'x 914 (11th Cir. 2018) ("The Eleventh Circuit has held that, at a minimum, protected activity requires a plaintiff to communicate his belief to his employer that discrimination is occurring."); *Burkes v. Hubbell Steel Corp.*, No. 2:06-CV-1959-VEH, 2007 WL 9717311, at *5 (N.D. Ala. Dec. 5, 2007) (general allegations of mistreatment fall far short of the protected activity required to sustain a retaliation claim"); *Louis v. HMSHost Corp.*, No. 20-CV-61727-RAR, 2020 WL 13389301, at *2 (S.D. Fla. Dec. 14, 2020) (plaintiff's objection to cleaning with chemicals due to fear for the safety of her unborn child did not constitute protected activity) (citing *Newsome v. IDB Cap. Corp.*, No. 13-CV-6576 (VEC), 2016 WL 1254393, at *25 (S.D.N.Y. Mar. 28, 2016) ("General allegations of mistreatment do not constitute protected activity.") (citing *Drumm v. SUNY Geneseo Coll.*, 486 F. App'x 912, 914 (2d Cir. 2012))); *Slater v. Progress Energy Serv. Co., LLC*, No. 8:09-CV-208-T-24EAJ, 2010 WL 3788824, at *9 (M.D. Fla. Sept. 24, 2010), *aff'd sub nom. Slater v. Energy Servs. Grp. Int'l Inc.*, 441 F. App'x 637 (11th Cir. 2011) (statement that plaintiff's "pregnancy 'should not cause [her] any problems'" . . . is too vague and does not include any objection to a violation of law, and therefore does not qualify as a protected activity"); *Bicknell v. City of St. Petersburg*, No. 8:03–cv1405–T–27MAP, 2006 U.S. Dist. LEXIS 8789, at *24–25 (M.D. Fla. Mar. 6, 2006) ("Complaints or grievances made in the absence

of some allegation of conduct proscribed by Title VII do not constitute statutorily protected activity.") (citing *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074–75 (11th Cir. 1995) (noting that allegations of "unfair treatment," absent some harassment or discrimination, is not an unlawful employment practice).

Because Holloway cannot establish a prima face case of retaliation, summary judgment must be granted as to this claim, and the Court need not address the parties' arguments regarding the remainder of the retaliation claim.[9]

## IV.   CONCLUSION

For the above reasons, it is ORDERED that TelaGen's Motion for Summary Judgment (Doc. 35) is GRANTED, and the case is DISMISSED with prejudice.

A final judgment will be entered.

DONE this 14th day of October, 2022.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE

---

[9] On this record, even if Holloway had established a prima facie case for retaliation, Holloway's retaliation claim still suffers from the same flaw as her discrimination claim: there is no substantial evidence rebutting TelaGen's explanation for the termination decision from which a jury could conclude that TelaGen's reasons were pretext for retaliation.